Good morning. May it please the Court, Kara Hartzler on behalf of Mr. Cabrera. Mr. Cabrera did not get a fair trial because the District Court excluded his only witness whose testimony would have gone to the only contested element at trial, which was mens rea. The District Court also committed other trial errors and miscalculated the guidelines range, and for these reasons this Court should either remand for a new trial or at least for resentencing. So I'll start with the issue of Mr. Cabrera's witness. This witness was a local immigration attorney who would have testified that about 8 to 10,000 asylum seekers were camped out along the U.S.-Mexico border in the area very close to where Mr. Cabrera crossed the border. Now the importance of this testimony would have gone to Mr. Cabrera's mens rea, which again was the only contested element. If this testimony didn't come in, which it didn't, essentially the jury would have wondered, well, why wouldn't an asylum seeker who was crossing with the intent to go into custody just have gone to a port of entry? What would have been the closing argument that would have been given based on the testimony? Had it come in as you wanted it to come in? So I think that's a wonderful point, Your Honor, and the reason is because the closing argument we gave was essentially, well, he came to apply for asylum, and you can try to cross the border and go into custody and apply for asylum. With this witness's testimony, what we would have done is said, look at this huge backlog of asylum seekers along the border. You have to wait at least six months in order to go to the port of entry and apply for asylum. So that was the critical difference that this jury, why a person in Mr. Cabrera's situation... How would that have tied to him? You're still talking at the abstract level. Tie it to him. Well, I think, Your Honor, it would have been impossible for anyone who entered at the time and place that Mr. Cabrera did to be unaware of all of these asylum seekers who were along the border, these 8,000 to 10,000. And so it tied to him because if our witness had come in and testified about that fact and that backlog, a jury would have been much more likely to believe that Mr. Cabrera entered to avoid that wait at the port of entry. But counsel, with respect, she was a lay witness or would have been a lay witness, right? Were there other ways that you could have gotten similar testimony before the court? We tried. We tried to get it in through questioning the Border Patrol agents that were the government's The problem is that when we did that, they essentially gave either vague testimony and said, well, I don't know anything about that backlog, or they actually denied the existence of a backlog. So that actually backfired on us and made it sound like there wasn't that. I guess what I'm troubled with, whether one agrees with the Remain in Mexico policy or not, widely known, but if your client can do what he did and, in quotes, get away with it, in quotes, why wouldn't all 15,000 people do exactly the same thing? And I understand that concern, Your Honor. But I want to be very clear. The jurisprudence that allows this official restraint policy and the mens rea that relates to that official restraint has been in effect since 2005, I believe, for about 18 years. In that time, there have been fewer than five cases that I'm aware of coming before this court where that has been the defense. So even though this case law has been in effect that would allow this type of defense to happen, it really doesn't happen that much. Okay. Well, I take that point. I get that. But under Rule 403, as you know, the judge has a lot of discretion. Correct. And as my colleague has pointed out, he kept focusing on the fact that this is really extraneous. This is out there. Obviously, your client wasn't going to get on the stand and testify, but there are many other ways you could have gotten, like in public documents, there was all kinds of congressional testimony about this kind of thing. There are other public officials you could ask to come. You could testify about the same thing. There are a few Democratic congressmen in the area that would have been happy to testify, I suspect. But the reality is it's pretty abstract. And what I struggle with is why, even if it's wrong, it's not just harmless error. What's your best argument that it's not harmless error? Not harmless error. Three reasons, Your Honor. Okay. The first reason, obviously, as I've said, is this was about the only contested alimentate trial, mens rea. Second, as I've also mentioned, this was the only way, and we can go back and forth, and I take Your Honor's point that maybe there was a public official who could have talked about this, but I'm not sure that the same concern from the district court wouldn't have come up. That, well, how did this relate to your client? And the fact is, Your Honor, that this court's decisions in Rahm, in Crosby, and Hernandez all do not require my client to testify in order to lay a foundation. What's different about Rahm is Rahm, the, she was testifying about her evaluation of him specifically. So it's tied to him. And that seemed to be what really troubled the district court, is that this isn't tied to him. It's just a general fact. And if it comes in in this case, it comes in in every case. And that, it, he wanted a foundation that ties it into this case. Your Honor, I, if, I don't believe that that is a distinction that makes a difference. But even assuming that the court believes it does, there are plenty of cases in this court's jurisprudence that hold that there doesn't need to be that specific connection. In our reply brief, we specifically talked about Sepulveda Barraza and Murillo, and all the cases that allow the government to introduce witnesses that would give background information about mens rea and drug cases. So, for instance, if the government is trying to prove that someone knew that there were drugs in the car when they crossed the border, they can call a witness who has absolutely no connection to that particular defendant. And that evidence comes in as a regular course. There's no difference here. There is no greater connection between the government's witness in that kind of case versus our witness here. Both were providing background information. Yet, counsel, with respect, lots of judges have excluded that kind of witness that would have helped the government. Because they say, like, you know, this is pretty extraneous stuff. We don't really need this. I want to move this along. Let's move. That's really what happened here, isn't it? Well, I can attest, and certainly, you know, my friend across the aisle can correct me if I'm wrong, but this type of evidence regularly comes in. It is a general rule. I know it can. But that's why under 403, the judge, it's an abuse of discretion standard, right? So unless it is a clear error of law, we generally defer to the district judge, do we not? Your Honor, I would point out that in many cases, where the evidence goes directly to the theory of defense, that that is the type of situation that this court in Crosby has When it goes directly to the mens rea, and when it is crucial to the defendant's defense, which it was here for the reasons we pointed out, it simply cannot fall under a 403. I guess what I struggle with is, my colleagues made the point very well in connection with Rahm, if you tie it to the person, that's one thing. But this is general information. You could have asked anybody. You could have asked Jose Martinez at the border, who works in the bar, who's seen this, who's talked to people, and have him come and talk. This is not the same kind of evidence. I get your point. I empathize with the issue that mens rea is a huge issue. There may have been other ways to get it in, but I'm struggling with why we have to fault the district judge, given the abuse of discretion standard under 403, for excluding this witness. I think, if I can take one more shot at convincing you, Your Honor, I think there is no doubt whatsoever in the record that this immigration lawyer had evidence talking about the very area, this area of several miles, where Mr. Cabrera entered. Now, if we were dealing with the situation where my client had entered 30 miles out in the desert, and there was no indication that he had saw or been in this area, I take Your Honor's point. But it's a circular logic to say that we can't get evidence in relating to the time and place where he entered. You may be able to do that, but my point is, Jose Martinez, the bartender who's in the same area, right where your client crossed, could have made the same kind of statement. Because your proposed witness was not an expert witness, indeed was an advocate, an attorney advocate for people in this similar situation. I don't know about the credibility, but the reality is, there may have been other ways to get it in, but it was pretty abstract, and I'm struggling with how the district court can be faulted. Do you have other things you want to cover? Yes. Thank you, Your Honor. I would like to make sure that we get into the issue of sentencing, because I think that's a really straightforward area. And I would like to basically start by reading to this court the specific statutory provision that I think resolves this issue. Which issue again, Anne? This is the sentencing issue. The question is, did my client, for a prior 1326 offense, receive a sentence? Forgive me, but I just want to be sure of one thing. Do you concede that for purposes of the question, your Miranda issue, that our case law says we treat this like a Terry stop? Do you agree with that? I agree. The two ways I would distinguish this case is, there is no precedent in this court that deals with a case between border fences, and there's no case that I'm aware of before this court that deals with a case where there was a fourth question that deals with the purpose why the person came. And I think that's what factually distinguishes this case. But I'll move on to sentencing, if Your Honor will allow. So the most important statutory provision for purposes of this situation is 18 U.S.C. 3584A. And the key phrase is this. Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently. What that says is, here, we had two separate hearings, and the record is silent as to whether the plain language of this statute, because the record was silent, it had to run consecutively. That meant there were only four days on the revocation sentence, and as a result, Mr. Cabrera had a sentence of less than 13 months and should have been in a lower guidelines range. Ms. Hartzler, could you explain to me why this particular issue, the answer to this particular question, is not bearing on an appropriate sentence in the case? If I'm understanding Your Honor's question, is this going to the issue of harmlessness or? Indirectly. But it seems utterly arbitrary. Your Honor, I would say... If we got an executive agency making a decision on the basis of whether we count the time for both sentences or for just one, I would be inclined to throw it out as arbitrary and capricious, if there were any significant stakes. Your Honor, I think my best response is, in Molina-Martinez, the Supreme Court, and in this Court's decision in Munoz-Camarena, the courts have been very, very clear that if there's a miscalculation of the guidelines, that in almost every case, this needs to go back for resentence. Well, could a district judge look at this and say, this makes utterly no difference to me? A judge could do so, but that judge didn't do so here. The judge here didn't say, I would have imposed the same sentence regardless of the guidelines range. And in fact, there are four exceptions that this Court has pointed out in footnote 5 of Munoz-Camarena. None of them apply here. And under this Court's case law then, there was a miscalculation of the guidelines, and remand is necessary. I would like to save some time for rebuttal if that's possible. You're welcome to do so. Thank you, Your Honor. Very well. We'll next hear from Mr. Howe for the government. Thank you, Your Honor. And good morning, may it please the Court. Zach Howe for the United States. I'll begin with the exclusion of the testimony on the asylum backlog. The District Court didn't abuse its discretion here. That testimony was irrelevant, it was unduly confusing, and it was unduly misleading. There was no link between this asylum backlog and Cabrera. There was never a point at which evidence was introduced or proffered that would allow a reasonable juror to conclude that Cabrera actually knew about this backlog, let alone relied on it. And maybe just to address these different lines of cases, Rahm and the cases relating to value evidence, why is it that, for example, the value of drugs come in? Why is it that the evidence in Rahm comes in, but the evidence here doesn't? An easy framework is ask if the evidence would still be relevant if the defendant didn't know about it. And if the answer is yes, then that evidence comes in. If the answer is no, then you have to bridge the analytical gap and show that the defendant, in fact, knew about it. So look at Rahm. Rahm, you were dealing with testimony that the defendant had poor visual perception. And I believe I make an error in my brief. I say poor vision. It's actually visual perception. She had good eyesight, but she didn't perceive a lot. She didn't take in a lot based on what she saw. Well, that would tend to suggest that when she's handling counterfeit bills, she might be less likely to notice that they're counterfeit. And that's true whether or not she knows she has poor visual perception. So there's zero analytical gap there. That's why the evidence should have come in in Rahm. And then look at these drug cases. And I'll use value as an example. Why does the drug value come in? Well, that's because the argument is, look, a drug cartel doesn't want to lose these really valuable drugs, so they're not going to use an unknown courier who could go anywhere and do anything with the car. That argument is going to be true or is going to apply whether or not the defendant knows the value of the drugs in the car. So again, there's zero analytical gap. That's very different than what we have here. Here, the asylum backlog does no work if Cabrera doesn't know about it. Because the entire premise of the argument is that he wanted to jump over the fence to prove the proffer was that it would have been testimony about the physical presence of very large numbers of people. And you could readily infer from the evidence that he was in that area that he'd obviously know about that. So to my knowledge, Your Honor, and there was a lot of discussion of this. It's 35 pages of transcripts, 17 through 52 of the record. There was never a point when there was a proffer that this immigration lawyer was going to go along the border at the part of the border where Cabrera entered. The testimony was going to be that at ports of entry, there was this long line and there was this asylum backlog. Of course, here the nearest port of entry was, I forget what it was, 20, 30 miles away. So certainly there wouldn't have been a line snaking 30 miles to where this defendant actually entered. So there was nothing to show that the defendant actually knew about that backlog. And again, that's the problem. This is evidence that he had to know about to be able to use it to make a mens rea argument. That's why there was an analytical gap. So this case is really similar to this court's Powell case. In Powell, the court said, look, if a defendant wants to introduce testimony or wants to introduce materials to show his mind state, in that case his willfulness, then he has to show that he relied on it. He has to lay that foundation. And there was some argument that Powell really just stands for the proposition that the court instructs on the law, that's why the materials didn't come in. That is not what Powell stands for. There the charge was willfully failing to enforce. The court instructs on what the law is, but putting in statutes or case law would be relevant to show that the defendant thought the law didn't require him to file tax returns. So there the legal materials being introduced as evidence was really just like any other evidence. And the court said, if you want to introduce that material to show mind state, you've got to bridge the analytical gap. That didn't occur. So here we're in Powell land. This court can apply Powell and affirm. And then, of course, if you get to 403. I gather it would be the government's position that that's what Judge Burns did here. That's what Judge Burns did here on relevance, and then he went a step further and applied 403 and said that this would be unduly confusing and unduly misleading. And there it's similar rationale, and this court has a similar case on the 403 issue. That's Espinoza-Baza. There you had evidence that the defendant's grandfather was a derivative citizen. That would tend to suggest that the defendant might have been a derivative citizen, and so he, you know, the alienage element would fail. But the court said, look, there's a bunch of additional facts that have to come in between to get there. And without those additional facts, then the testimony is unduly confusing and misleading. And so on 403 grounds as well, this was an appropriate ruling, even if the court thinks there was some marginal probative value to that testimony on an asylum backlog. And then, of course, as has been alluded to, even if there was an error here, that error was harmless. At page 285 of the record, the apprehending officer testifies that Cabrera said he was coming for work, just for work. So he's been very clear about what his intent is. There's no mention at all of asylum. It wasn't, I came to work while applying for asylum, or I came to apply for asylum and then to work. It was just, came to work. So no jury would believe some sort of speculation about the defendant's intent based on generalized testimony about an asylum backlog, instead of simply believing what the defendant actually said, which is that he came to work. So if there was any error in admitting, in excluding this testimony, then it would be harmless for that reason. We had a brief discussion of the Miranda issue, and Ms. Hartzler said there were two issues that kind of take this out of the realms of this court's cases. I'm happy to address those. So the first was that this stop took place in between border fences. And that certainly suggests it's a restricted area. It's not an area that the public has access to. But what this court has said in Medina Villa, Cervantes Flores, Galindo Gallegos, is that the sort of public or non-public nature of the stop goes to the question of whether a reasonable, innocent person would fear abuse by an officer. And here the answer is no. This stop took place in daylight hours, outdoors, on video camera. It took place in an area that's butted up right against Tijuana. In fact, you can see in the video that there's a whole structure, you know, there are a bunch of buildings on the Tijuana side of the border that are looking right down at where this stop occurs. And then on the other side, the U.S. side of the border, is the Border Field National Park. So it's a public park and there was testimony that people barbecue there. So this is an area where you've got public-facing things on both sides of the border, both sides of the border, overlooking what's happening here. And then, of course, I think it's important to note that this is the area that Cabrera chose. It's not as if agents or the agents – there was one – hauled Cabrera to this place to question him. Counsel, with respect, I take your point. What, to me, saves the government's position are the cases that this is a terrorist stop. But realistically, here's a Border Patrol agent, he comes up, Cabrera's there in his shirt, was it orange or something like that, and you've got a fence on both sides. What reasonable person would think that he could just take off, go back to Mexico? I don't think a reasonable person would think that, Your Honor. But I'll simply note that the inquiry is not, does the person think they're free to leave? It's, would a reasonable, innocent person think that they are free to leave after answering a moderate number of questions confirming or dispelling suspicion? Okay, and that's the terrorist stop analogy to some degree, right? Exactly, Your Honor. And here I will simply note, in terms of the actual area where this questioning occurred, it is actually more public-facing than the areas dealt with in Cervantes Flores and Galindo Gallegos. In Cervantes Flores, you were dealing with an area that was three-fourths of a mile from the nearest road, and it was in the middle of the desert, and that's because there had been a chase to get to that point. So, no one is going to see what's going on during the questioning in that case, and yet still the court held that it was sufficiently public to not constitute custodial interrogation. And then Galindo Gallegos, the description was that it was an isolated area near the border that was not particularly public. Here, again, it's absolutely true this was between border fences, but it was more public in the sense that it's right up against all these buildings on the Tijuana side, and it's right up against a public park on the U.S. side, and it's on video camera and daylight hours. Is there any evidence in the record that suggests that Mr. Cabrera was aware that his encounter with the agent would be basically videoed? There's no indication of that, and so I think this goes to one piece of the sort of public-nonpublic distinction but not the other, because the question is, would a reasonable person fear abuse by an officer, and would abuse actually be possible given the situation? So, here I don't think it helps us in terms of showing that Cabrera wouldn't fear abuse by an officer, but it certainly shows that there wouldn't have actually been opportunity for abuse because the officer very likely does know he's on camera. Is it the government's position that, even putting aside for a moment our Terry Stopp type case law, that Mr. Cabrera was not basically confined, yet an officer didn't handcuff him, didn't do anything other than ask him questions that he would naturally have under the circumstances, no guns, or anything like that? Is it your position that even if this were in a different environment, that it probably wouldn't have qualified as something that would require Miranda warnings? I think that is quite possibly true. It's possible that in a different environment, if they transported him to some confined cell, then very likely he would be in custody, even if they're not drawing their guns or something like that. But if they, for some administrative reason, potentially need to transport him to another open-air public place, then maybe it wouldn't be custody because those other factors weigh in the custody. My colleagues, but I'm kind of interested in your response to your friend's comments about sentencing. What's your take on that? Sure. So I think there are two questions that go into the sentencing issue, one of which is before the court and one of which is not. The first question is, what was that time served sentence? And that is a question before the court because it relates to how you calculate the criminal history. If the judge, instead of using the words time served, had said your sentence is 134 days, would his actual term of incarceration have been different? No, I think practically speaking, it would have been the same. I think it would work a little differently in that then the BOP's requirement that they give credits under 3585B would kick in because then you're not dealing with just defining the sentence, you're dealing with actually giving credit towards the sentence. But I thought the issue was that there was overlap between the two sentences, the revocation on the 2015 case and the sentence on the 2017 case, and that he would have been barred from getting credit in both cases. And so the 134 without credit would have been a lot longer. That's correct. So if it was 134 days and it's running, I guess, consecutive and the case that BOP would not be able to credit the time in custody other than the four days towards the 134. But you're saying that the words he said were time served and we should treat that as if it said 134 days. But if he had said 134 days, it would have been a very different real world scenario. And that's what I'm struggling with here. I think if he had said 134 days consecutive, then that is where the trouble you're mentioning would set in. Here, I think the best way to look at it is that, I don't even know if you have to use the label concurrent or consecutive, but if you want to just think about it as a concurrent sentence, it's clear that that's what the court was doing. And that's clear from the record SER 22. The court says, look, you've been in custody for six months. You got time served on the underlying crime. I'm going to give you time served on this sentence. So it's clear he's trying to incorporate more than just the four days. That's a period of time that was never mentioned. And because he wants it to be time served, it's clear that he wants him to get out. So he wants it to be concurrent. How do you respond to opposing counsel's statutory reference about how these things are supposed to be treated, i.e. specifically, unless the judge says differently, they're consecutive? Sure. And I see I'm out of time. Happy to answer the question. So 3584A absolutely says that when you have multiple sentences imposed at different times, then they run consecutive unless the judge says otherwise. Here, our argument is that the judge doesn't expressly say, I am imposing concurrent sentences. But he does say, you spent six months in custody. I'm sentencing you to time served, just like you got in the 1325 case. And so it's clear based on the context of those comments that the court is trying to impose a time served sentence that will require no more time spent in custody and that overlaps with the time spent in custody on the 1325. That is, in effect, a sentence. The final point, if you'll permit me, I said there were two questions here. The question for this court is, what sentence did he get? And I think based on context, that's 134 days. The question not before the court, though, is was it correct? Because that is an issue for 2255 proceedings. That would be a collateral attack on the sentence. We cite the Harrison case at page 47 of our brief for that proposition. So I think that would actually prevent this court from having to kind of get into these sticky issues on whether it was proper to give this 134 day sentence that overlapped with some other custody. That's all a question for collateral proceedings. Any other questions about my colleague? Very briefly, does Mr. Cabrera in the United States have any criminal record other than these illegal entries? Yes, he has a number of offenses that are pretty old and don't score. Say that again, please. He has a number of offenses that go back quite a ways that don't score. And then he has some immigration offenses. And I don't recall off the top of my head if he has any scoring non-immigration offenses. But yes, he does have some other criminal histories. Thank you. Other questions? Thank you very much. Thank you. We have a little time for rebuttal. Ms. Parchler. Thank you, Your Honor. I'd like to make two quick points about the witness issue, two quick points about the sentencing issue. First of all, a factual clarification. I believe, if I heard correctly, that opposing counsel said that the point of entry was about 20 to 30 miles away. It was actually five miles away. That's at ER 269. And this was in an urban area, a very developed urban area. That's at ER 302. So I want to be... Does it make a difference in terms of our analysis? It does, Your Honor. If it had been 20 to 30 miles outside, then I think it was very possible that Mr. Cabrera could have entered 30 miles away without seeing those crowds. Five miles away, this is an urban Tijuana dense area. I don't think he could have entered. And that's the connection that's really important here. So my second issue on... And this is sort of a big picture response. I think the most important thing that this court needs to consider under the 403 analysis is this. Was there the ability of the jury to consider all the facts? What the district court essentially did here was say, I am going to prejudge what the jury can consider, the facts the jury can consider. So the government is correct. Mr. Cabrera said initially that he came to work. But the jury could have weighed that against all the other evidence we presented that he had previously sought asylum, that he came and sat down by the fence for seven minutes, that he didn't have a rope, that he did this in broad daylight in a heavily patrolled area. All we're asking for is that the jury have the opportunity to see all the facts and make the decisions that are for the jury to make. So two brief points on sentencing, and I apologize. I make it really quick, I promise. This is not a collateral attack because there was no, in other words, had there been some sort of judicial finding previously that this was a concurrent sentence, then yes, this might be a collateral attack. But there was no previous finding. This was an issue to consider in the first instance about what was the actual sentence that he got for that time served. And then my final point is, opposing counsel talks about how this must have been six months because there was a reference to six months. In fact, that reference to six months shows that it was not a six-month sentence because, or it was not a concurrent sentence, because the petition for the revocation had only been filed four and a half months earlier. So in other words, he could have only gotten at most four and a half months of a time served sentence. And I believe that counsel said that the judge said that he didn't just, that he got six months just like you got in the 1325 case. That sentence is not in the record. So those are my points. Thank you, Your Honor. Questions by my colleagues. Thanks to both counsel for your helpful arguments in this case. The case of United States v. Cabrera is submitted.
judges: SMITH, Hamilton, COLLINS